In re:  Andrew F. PISKO, Debtor.

Andrew F. Pisko, Plaintiff,

v.

United States of America, Internal Revenue Service, Defendant.

Bankruptcy No. 8:05–BK–22998–PMG.
Adversary No. 8:05–AP–791–PMG.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Feb. 8, 2007.

Kim L. Kaszuba, Buddy D. Ford, PA, Tampa, FL, for Plaintiff.

Brian R. Harris, US Department of Justice, Tax Division, Washington, DC, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing.

The Debtor, Andrew F. Pisko, commenced this proceeding by filing a Complaint to Determine Dischargeability of Debt. In the Complaint, the Debtor seeks a determination that his income tax liabilities for the 1998, 1999, 2000, and 2001 tax years are dischargeable in his Chapter 7 case.

In response, the United States of America, Internal Revenue Service (IRS) asserts that the liabilities are excepted from the Debtor's discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code, because the Debtor willfully attempted to evade or defeat the taxes.

The parties agree that the sole issue in this case is whether the Debtor's income tax obligations for 1998, 1999, 2000, and 2001 are excepted from discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code. (Doc. 18, IRS Trial Memorandum, p. 1; Doc. 22, Debtor's Trial Memorandum, p. 1).

### General Background

The Debtor and Daisy Pisko have been married since 1998, and lived in New York from at least 1998 until 2003. (Transcript, p. 94). Daisy Pisko is an administrator at a learning center. The Debtor testified that he holds a college degree in accounting, and had earned approximately $24,000.00 or $25,000.00 per year prior to 1998. (Transcript, p. 54).

In April of 1997, the Debtor began working for Strategic Recruiting, Inc. (SRI) as a "headhunter" for technology professionals in New York City. (IRS Exhibit 4; Transcript, pp. 22–23).

SRI was a small company, consisting of only the owner, at the time that the Debtor began working. The Debtor's agreement with the company provided that his earnings would be based on the salaries of the professionals that he placed. It appears, however, that the Debtor and SRI never reached a formal agreement as to whether the Debtor would be treated as an employee of the company, or whether he would be treated as an independent contractor for purposes of characterizing his compensation. In any event, although the Debtor received W–2 earnings statements pertaining to 1998, 1999, 2000, and 2001, it is clear that insufficient sums were withheld from his paychecks to cover his tax liability for each tax year.

In 1998, the Debtor earned the sum of $119,980.00 from SRI. (IRS Exhibit 9).

In 1999, the Debtor earned the sum of $107,141.00 from SRI. (IRS Exhibit 9).

In 2000, the Debtor earned the sum of $297,706.00 from SRI. (IRS Exhibit 10).

In 2000, while the Debtor was working for SRI, he and his wife purchased a bar in New York City for the purchase price of $63,000.00. (IRS Exhibit 4; Transcript p. 29). Although the Debtor and his wife both worked in the bar, which was known as the Union Square Lounge, the lounge never operated profitably. During their tenure as owners, the Debtor invested personal funds in the amount of $15,000.00 to $20,000.00 per month to sustain the business. (Transcript, pp. 30–31, 94).

In 2001, the Debtor earned the sum of $97,987.00 from SRI. (IRS Exhibit 9).

The Debtor's work with SRI terminated in February of 2003. (IRS Exhibit 4).

In April of 2003, the Debtor sold the Union Square Lounge for the sale price of $25,000.00, or $38,000.00 less than his original investment. The Debtor asserts, how-

ever, that he never actually received any proceeds from the sale. (Transcript, pp. 30–31).

Between February of 2003 and September of 2003, the Debtor and his wife moved from New York to Florida. At the time of their relocation, their only funds consisted of approximately $5,000.00 that Daisy Pisko had saved from her separate earnings. (Transcript, pp. 32, 96).

Upon moving to Florida, Daisy Pisko began working as a director at the Sylvan Learning Center in the Tampa area. The Debtor has been unemployed since their relocation. The Debtor testified that he suffers from severe depression and other conditions that prevent him from obtaining regular employment. (Transcript, p. 39).

In September of 2003, the Debtor and his wife acquired a home located on Mirror Lake Avenue in Tampa for the purchase price of $174,900.00. The Residential Sale and Purchase Contract identifies Daisy Miranda–Pisko as the sole purchaser of the property. (Debtor's Exhibit 8). It appears that Daisy Pisko obtained the financing for the home based on her individual credit history, and also made the initial down payment on the home with her separate funds. (Transcript, pp. 34–35, 97). The deed to the home, however, was recorded in the joint names of Daisy Pisko and the Debtor.

The Debtor and Daisy Pisko owned the Mirror Lake home for approximately one and one-half years. During that period, Daisy Pisko made all of the mortgage payments on the property with her separate earnings from her employment. (Transcript, pp. 35, 98–99).

On April 12, 2005, the Mirror Lake Avenue home was sold for the price of $249,000.00. (Debtor's Exhibit 4; IRS Exhibit 3). After payment of the existing mortgage in the amount of $179,884.45, the net proceeds from the sale were $46,086.91. The equity received from the home was due almost exclusively to the appreciation of the property, and not to any significant reduction in the mortgage balance.

The proceeds from the sale were deposited into a bank account owned solely by Daisy Pisko at AmSouth Bank. (IRS Exhibit 8).

The Debtor and his wife both testified that the funds were deposited into Daisy Pisko's separate account primarily because of an agreement that they had reached following an incident of marital indiscretion on the Debtor's part. As a result of the incident, Daisy Pisko demanded that the proceeds from the sale of the house be placed solely in her name, and the Debtor agreed that the funds should belong to her. (Transcript, pp. 38, 100, 105).

The Debtor and Daisy Pisko testified that approximately $12,000.00 from the sale proceeds was used to pay the expenses associated with their effort to adopt a child in Honduras. (Transcript, pp. 37, 106). They also testified that approximately $5,000.00 of the money was used to pay the funeral expenses for Daisy Pisko's sister. The remaining funds were used to pay their living expenses, and to pay their credit card obligations where possible. Daisy Pisko testified that most of the credit card debt that she paid from the bank account was hers, although she periodically paid small amounts on the Debtor's obligations as well. (Transcript, pp. 107–08).

In any event, shortly after the sale of the Mirror Lake home, the Debtor's wife purchased a condominium located on Harbour Island Boulevard in Tampa. The purchase price for the condominium was $260,000.00. Other than an initial payment in the approximate amount of $5,000.00, the Debtor's wife financed the entire amount of the purchase price. Dai-

sy Pisko makes all of the mortgage payments on the condominium, and otherwise pays the expenses associated with the property from her independent earnings. (Transcript, pp. 88, 98–99, 109–110).

The Debtor filed a petition under Chapter 7 of the Bankruptcy Code on October 10, 2005. On his schedule of assets, the Debtor disclosed that he does not own any real property, and that the only personal property that he owns consists of a one-half interest in certain household furnishings ($750.00) and his clothing and personal effects ($200.00).

On his schedule of liabilities, the Debtor listed unsecured priority claims in the total amount of $231,618.79. The priority claims primarily consist of the income tax liabilities related to the 1998, 1999, 2000, and 2001 tax years. The Debtor also listed general unsecured claims in the total amount of $44,984.00.

The Debtor subsequently filed a Complaint to determine the dischargeability of the income tax obligations that are due for the 1998, 1999, 2000, and 2001 tax years.

### The Tax Liabilities

Certified Literal Transcripts of the Debtor's income tax accounts for 1998, 1999, 2000, and 2001 were admitted into evidence by the IRS. The Literal Transcripts provide the following information regarding each of the accounts:

**1998**

The Debtor's adjusted gross income in 1998 was $119,980.00.

The Debtor requested an initial extension of time to file his 1998 tax return until August 15, 1999, and also requested a further extension to file the return until October 15, 1999.

The Debtor actually filed his return for the 1998 tax year on April 15, 2000. Based on the return, a tax in the initial amount of $12,380.00 was assessed for the 1998 tax year. (IRS Exhibit 9). Withholdings from the Debtor's compensation totaled $5,759.00, and the Debtor paid $6,631.00 with his return. Late filing and late payment penalties and interest were assessed, however, and an additional tax was assessed by examination.

The Debtor made subsequent payments on his 1998 tax liability on July 12, 2000, in the amount of $200.00, on August 21, 2000, in the amount of $200.00, on September 12, 2000, in the amount of $2,207.00, and on April 16, 2003, in the amount of $150.00. (IRS Exhibit 9).

The amount of the Debtor's tax liability for the 1998 tax year, as of August 29, 2005, was $37,357.85. (Doc. 8, p. 2).

**1999**

The Debtor's adjusted gross income in 1999 was $107,141.00.

The Debtor filed his return for the 1999 tax year on December 5, 2000. Based on the return, a tax in the initial amount of $19,082.00 was assessed for the 1999 tax year. (IRS Exhibit 9). Withholdings from the Debtor's compensation totaled $10,289.00, and the Debtor paid $1,500.00 with his return. Late filing and late payment penalties and interest were assessed.

Commencing in January of 2001, the Debtor made a series of twelve payments on his 1999 tax liability. Generally, the payments were in the amount of $500.00 each. According to Ray Zacek, the IRS bankruptcy specialist who testified at trial, the payments were made pursuant to an installment agreement with the IRS, as evidenced by the allocation of $43.00 to an installment agreement fee charged by the IRS. (IRS Exhibit 9; Transcript, pp. 123–24)

The amount of the Debtor's tax liability for the 1999 tax year, as of August 29, 2005, was $6,524.84. (Doc. 8, p. 2).

**2000**

The Debtor's adjusted gross income in 2000 was $297,706.00.

The Debtor requested an initial extension of time to file his 2000 tax return until August 15, 2001, and also requested a further extension to file the return until October 15, 2001.

The Debtor actually filed his return for the 2000 tax year on June 5, 2002, and later filed an amended return on October 21, 2002. No payments were submitted with either the return or the amended return, although the IRS credited the Debtor with the sum of $12,805.00 that was withheld by SRI. (IRS Exhibit 10).

The taxes, penalties, and interest were assessed, and the amount of the Debtor's tax liability for the 2000 tax year, as of August 29, 2005, was $133,055.05. (Doc. 8, p. 2).

**2001**

The Debtor's adjusted gross income in 2001 was $97,987.00.

The Debtor requested an extension of time to file his 2001 tax return until August 15, 2002. The Debtor actually filed his return for the 2001 tax year on May 23, 2003. No payment was submitted with the return. Based on the return, a tax in the initial amount of $18,104.00 was assessed for the 2001 tax year. (IRS Exhibit 9). Credit was given for withholdings in the amount of $1,310.00, and late filing and late payment penalties and interest were assessed.

The amount of the Debtor's tax liability for the 2001 tax year, as of August 29, 2005, was $28,634.73. (Doc. 8, p. 2).

As of August 29, 2005, the amount of the Debtor's tax liability for all four of the tax years at issue totals the sum of $205,572.47. (Doc. 8, p. 2).

**Discussion**

The Debtor commenced this adversary proceeding by filing a Complaint seeking a determination that his tax liabilities for 1998, 1999, 2000, and 2001 are dischargeable in his bankruptcy case.

In response, the IRS contends that the "Debtor's late filing of his tax returns coupled with depositing the proceeds from the sale of their residence into his wife's account constitute a willful attempt to evade or defeat the payment or collection of his tax liabilities and render Debtor's taxes for the 1998–2001 tax years non-dischargeable." (Doc. 18, p. 2).

As set forth above, the sole issue in this case is whether the tax liabilities are excepted from the Debtor's discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code because of the Debtor's willful attempt to evade or defeat the taxes.

Section 523(a)(1)(C) provides as follows:

**11 USC § 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

.        .        .        .        .

(C) with respect to which the debtor made a fraudulent return *or willfully attempted in any manner to evade or defeat such tax.*

11 U.S.C. § 523(a)(1)(C)(Emphasis supplied). For a tax debt to be nondischargeable under the second prong of § 523(a)(1)(C), the attempt to evade or defeat the tax must be "willful," and the debtor must have engaged in "conduct" evidencing his attempt to evade or defeat the tax. *In re O'Callaghan,* 316 B.R. 550, 554 (Bankr.M.D.Fla.2004).

■ The IRS bears the burden of establishing by a preponderance of the evidence that a tax liability is nondischargeable under § 523(a)(1)(C) of the Bankruptcy Code. *In re Griffith*, 206 F.3d 1389, 1396 (11th Cir.2000).

**A. Willfulness**

■ To prove the "willful" element of the cause of action, the IRS must show that the debtor "(1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty." *In re Fretz*, 244 F.3d 1323, 1330 (11th Cir.2001).

■ Courts are often compelled to rely on circumstantial evidence, or "badges of fraud," to determine whether a debtor "intended" to violate his duty to pay taxes. *In re Cole*, 328 B.R. 237, 241 (Bankr. M.D.Fla.2005). The badges of fraud generally used to determine a debtor's intent include:

> (1) the recurrence of the understatement of income for more than one tax year; (2) the understatement of income; (3) implausible or inconsistent explanations of behavior; (4) inadequate records; (5) transfer of assets to a family member; (6) transfer for inadequate consideration; (7) transfer that greatly reduced assets subject to IRS execution; (8) transfers were made in the face of serious financial difficulties; and (9) any other conduct that is likely to mislead or conceal.

*In re Jacobs*, 2006 WL 2691516, at *15 (M.D.Fla.)(quoting *In re Greene*, 207 B.R. 21, 25 (Bankr.M.D.Fla.1997)).

■ Regardless of the presence of specific "badges of fraud," however, it is well-established that the issue of "whether a debtor has 'willfully' attempted to evade a tax is a question of fact which must be determined in light of the totality of the circumstances of the case." *In re Jacobs*, 2006 WL 2691516, at *14(Citations omitted). "The issue of whether Debtor willfully attempted to evade payment of taxes is a question of fact for the Bankruptcy Judge to determine from the totality of the record." *In re O'Callaghan*, 316 B.R. at 556(quoting *United States v. Uria*, 180 B.R. 688, 691 (S.D.Fla.1995)).

■ In this case, the Court finds that the Debtor did not "willfully" attempt to evade or defeat his tax liabilities.

The Court recognizes that certain indicia of willfulness are present in this case. It is clear, for example, that the Debtor filed his tax returns late for each of the years at issue, and that the proceeds of the jointly-owned Mirror Lake home were deposited into an account belonging solely to his wife. Nevertheless, the Court has observed the Debtor's demeanor, and has considered his explanations in their entirety, and finds that he did not possess the mental state required for nondischargeability under § 523(a)(1)(C) of the Bankruptcy Code.

First, the Debtor's income in 1998, 1999, 2000, and 2001 represents a sudden and substantial increase over his income in previous years. Although he holds a degree in accounting, the Debtor appeared unfamiliar with the amount of the tax liability that would be incurred on annual income of more than $100,000.00, or the amount that should be withheld by SRI during the course of the tax year. (Transcript, p. 27). Further, although the Debtor was generally aware that he might be entitled to take certain deductions to reduce his tax liability, he lacked knowledge of the documentation that would be necessary to support the deductions. (Transcript, pp. 52–54).

Second, the Debtor made partial payments with the returns filed for the 1998

and 1999 tax years, and also reached an installment agreement with the IRS regarding the 1999 taxes. Specifically, the Debtor made twelve payments pursuant to the installment agreement over the fourteen-month period beginning in January of 2001 and ending in March of 2002. (IRS Exhibit 9).

In connection with his efforts to reach an installment agreement with the IRS, the Debtor testified that he had at first attempted to engage JK Harris and Company to assist him in resolving the tax liabilities, but that the effort failed when JK Harris did not complete the work. The Debtor testified that he then engaged Wayne Rogers, a certified public accountant, to assist him in resolving the tax issues, but that he is uncertain as to what action the accountant took on his behalf. (Transcript, pp. 44, 61–61). In other words, although his efforts were not successful, the Debtor attempted to hire professionals to communicate with the IRS in accordance with its procedures.

In any event, as a third factor related to the "willfulness" issue, the Court finds that the IRS did not establish that the Debtor is able to pay a meaningful amount of the tax liability.

Although the Debtor earned significant income between 1998 and 2001, the evidence is clear that he experienced unmanageable losses as a result of his investment in the Union Square Lounge in 2000. The Debtor testified, for example, that the Lounge never operated at a profit, and that he infused $15,000.00 to $20,000.00 per month of his personal funds into the business. The Lounge was ultimately sold for substantially less that he paid for it. (Transcript, pp. 30–31).

The Debtor's wife corroborated his testimony regarding the failure of the Lounge. According to Daisy Pisko, the Debtor "lost everything" as a result of the investment.

She also testified that she and the Debtor continued to owe money and "have a lot of bills" stemming from the Lounge even after they moved to Florida. (Transcript, pp. 96–97).

Finally, there is no evidence in this case that the Debtor has enjoyed an opulent lifestyle at the expense of the IRS. Based on their purchase prices, it appears that the Mirror Lake residence and the Harbour Island condominium are not luxurious homes. The IRS did not present any evidence that the Debtor and his wife own personal property of remarkable value, or that their expenditures reflect an extravagant standard of living. The case is therefore readily distinguishable from the situation in *In re Jacobs*, 2006 WL 2691516, at *14, in which the Court expressly noted that the debtor had "engage[d] in outrageously lavish spending while ignoring his tax obligations."

In this case, there is no evidence that the Debtor deliberately chose to purchase luxury items or services rather than pay his tax obligations, and there is also no evidence that the Debtor has the ability to satisfy the tax obligations from his assets or income.

Given the totality of the record, and the unusual circumstances of this case, the Court finds that the Debtor did not "willfully" attempt to evade or defeat his tax liabilities.

### B. Conduct

As set forth above, for a tax debt to be nondischargeable under § 523(a)(1)(C) of the Bankruptcy Code, the attempt to evade or defeat the tax must be "willful," and the debtor must have engaged in "conduct" evidencing his attempt to evade or defeat the tax. *In re O'Callaghan*, 316 B.R. at 554.

To prove the "conduct" element of the cause of action, the IRS must show that the debtor's nonpayment of a tax is coupled with "specific conduct evidencing his attempts to evade or defeat the payment." *In re O'Callaghan*, 316 B.R. at 555.

> To summarize, as the law of this circuit now stands, the conduct requirement of § 523(a)(1)(C) is not satisfied where a debtor has filed accurate returns and simply failed to pay taxes as the debtor in *Haas* did.... The conduct requirement is satisfied, however, where a debtor engages in affirmative acts to avoid payment or collection of taxes as the debtor in *Griffith* did.

*In re Fretz*, 244 F.3d at 1328–29(citing *In re Haas*, 48 F.3d 1153 (11th Cir.1995) and *In re Griffith*, 206 F.3d 1389 (11th Cir. 2000)). The District Court for the Middle District of Florida recently reviewed the "conduct" requirement of § 523(a)(1)(C) as follows:

> In sum, *Griffith* stands for the proposition that in addition to providing proof that the debtor has failed to pay his taxes, the government must also proffer some evidence of acts evidencing an attempt "in any manner to evade or defeat a tax." 206 F.3d at 1395–96. The *Fretz* court went further and explained that acts of omission are also sufficient. 244 F.3d at 1329.

*In re Jacobs*, 2006 WL 2691516, at *8. Specific conduct that may warrant a finding of nondischargeability includes the transfer of assets to a family member for inadequate consideration, the denial of IRS access to the debtor's premises, the filing of late returns coupled with the understatement of income, the offer of implausible explanations of behavior by the debtor, and the failure of the debtor to maintain adequate records. *In re Cole*, 328 B.R. 237, 241 (Bankr.M.D.Fla.2005).

In this case, the Court finds that the Debtor's conduct does not evidence his attempt to willfully evade or defeat his taxes within the meaning of § 523(a)(1)(C) of the Bankruptcy Code.

The IRS points to the following specific instances of "conduct" to support its contention that the Debtor's tax liabilities should be nondischargeable.

### 1. Late returns

First, the IRS asserts that the Debtor's pattern of filing his tax returns late, combined with his failure to pay the taxes, is sufficient "conduct" to warrant a finding of nondischargeability under the reasoning of *Fretz*. (Transcript, pp. 141–42). Additionally, according to the IRS, the Debtor knew that SRI was not withholding sufficient funds to pay the taxes as they became due, but that he allowed the practice to continue for the four years at issue in this case. (Transcript, p. 143).

Under the circumstances of this case, the Court finds that the conduct described by the IRS does not evidence the Debtor's attempt to avoid payment of the taxes.

Although the Debtor is a college graduate with a degree in accounting, the Court finds that he is an unsophisticated taxpayer. The Debtor testified, for example, that he had previously earned no more than $24,000.00 to $25,000.00 per year, and that he had always received refunds based upon the tax returns that he had filed prior to 1998. (Transcript, p. 51). The 1998 tax year was the first year that he "actually made money" or made any "real money." In that year, he made approximately $100,000.00 more than he had earned in any previous year. (Transcript, pp. 52, 54, 55).

The Debtor testified that he knew that he was incurring a tax liability for the years in which he made more than

$100,000.00, and that he intended to pay the taxes from his future earnings. He believed that he could "work out some kind of plan or I would have an accountant work something out for whatever I owed." (Transcript, pp. 41, 53, 55).

The delay in filing his returns, however, was initially caused by the Debtor's unfamiliarity with the documents that he needed in order to claim certain deductions, and also by his unsuccessful search for an accountant to assist him in preparing the returns. The Debtor believed, for example, that he might be entitled to deduct certain travel expenses associated with his employment, along with other deductions "that I never knew about," to decrease his tax obligation. (Transcript, pp. 52–54). The returns were filed late because he was "putting together papers, it was finding the right accountants. And I went through several accountants . . . ." (Transcript, p. 53).

As to his knowledge that insufficient sums were being withheld by SRI, the Debtor testified that he thought the amount withheld was "regular," and that he would simply pay the additional taxes later. In fact, the Debtor testified that he thought that SRI was doing him a "favor" by withholding a portion of the accruing tax obligation, since that practice would decrease the amount that he would ultimately have to pay. (Transcript, pp. 56, 58).

Further, the Debtor purchased the Union Station lounge in 2000, and suffered "a tremendous amount of losses" from that business which negatively impacted his ability to pay the taxes. (Transcript, pp. 41, 44). The financially disastrous investment in the Lounge, in which the Debtor "lost everything," combined with a downturn in the recruiting business in 2001, rendered the Debtor unable to pay the taxes from his earnings as he had earlier intended. (Transcript, pp. 59–60, 96).

The Court acknowledges, of course, that a pattern of filing late returns, coupled with a taxpayer's failure to remit full payment, may constitute "conduct" evidencing the taxpayer's willful attempt to evade the tax in certain cases. Under the particular circumstances of this case, however, and after having evaluated the Debtor's candor and demeanor, the Court finds that the Debtor's "conduct" does not warrant a finding of nondischargeability.

### 2. The transfer

Second, the IRS contends that the deposit of the sale proceeds from the Mirror Lake house into an account belonging solely to the Debtor's wife is a transfer by the Debtor for inadequate consideration, and therefore represents "conduct" evidencing his attempt to avoid the taxes. (Transcript, pp. 146–48). The Mirror Lake home was owned jointly by the Debtor and his wife.

Although the deposit has the earmarks of a transfer designed to remove assets from the reach of the IRS, the Debtor explained that the sale proceeds were deposited into Daisy Pisko's account for reasons unrelated to his outstanding tax liabilities.

The Debtor's explanation is two-fold. First, he contends that his wife made the down payment on the Mirror Lake home with her separate funds, and that she obtained the financing to purchase the home based on her individual credit history. Daisy Pisko subsequently made all of the mortgage payments and paid the expenses related to the home from her personal funds. (Transcript, pp. 35–36, 89; Debtor's Exhibit 8).

The testimony of Daisy Pisko is consistent with the Debtor's testimony. Daisy

Pisko testified, for example, that she made the down payment on the Mirror Lake home with her money from her savings, and that she made all of the house payments on the property while they owned it. (Transcript, pp. 97–98). She also testified that she had good credit, and therefore financed the purchase. (Transcript, p. 102).

Daisy Pisko has been steadily employed since she and the Debtor moved to Florida. The Debtor has not been employed since 2003. (Transcript, pp. 35, 97; IRS Exhibit 4).

Since all of the funds used to acquire and maintain the Mirror Lake home were contributed by Daisy Pisko, and none of the funds were contributed by the Debtor, the Debtor contends that he had no interest in the proceeds from the sale of the house. Accordingly, the Debtor contends that the deposit of the proceeds into Daisy Pisko's account was not a transfer of his property.

Even if the Debtor did claim an interest in the proceeds, however, he asserts that he and Daisy Pisko had reached an agreement whereby she was entitled to the funds for reasons independent of the IRS. Specifically, the Debtor asserts that he had been involved in marital indiscretions prior to the sale of the home, and that he agreed that she should receive the proceeds to maintain their relationship following these indiscretions. (Transcript, pp. 38, 70).

Similarly, Daisy Pisko testified that she had demanded all of the sale proceeds after learning of the Debtor's indiscretions. She further testified that she made the demand so that she would be able to pay the bills, and that the agreement was not designed to avoid the Debtor's tax obligations. (Transcript, pp. 100, 105).

The Court evaluated the testimony of the Debtor and Daisy Pisko as it was presented, and is satisfied that the deposit of the sale proceeds into Daisy Pisko's account was not a transfer evidencing the Debtor's attempt to evade or defeat his tax liabilities. The "conduct" does not warrant a finding of nondischargeability in this case.

### Conclusion

The Debtor is seeking a determination that his income tax liabilities for 1998, 1999, 2000, and 2001 are dischargeable in his Chapter 7 case. The sole issue in this adversary proceeding is whether the liabilities are excepted from discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code based on the Debtor's "willful attempt to evade or defeat the taxes."

The Court finds that the IRS has not shown that the Debtor's avoidance of his tax obligations was "willful" within the meaning of § 523(a)(1)(C). Based on the Debtor's efforts to make partial payments and his inability to pay a meaningful amount of the total liability, among other factors, the Court finds that the Debtor did not deliberately evade payment of the taxes.

Additionally, the Court finds that the Debtor did not engage in "conduct" evidencing his attempt to evade or defeat the taxes. Although the Debtor admittedly filed late returns for the years in question, and also allowed his wife to receive the proceeds from the sale of their jointly-owned home, the Debtor provided explanations of these actions which demonstrated that they were not calculated to avoid the tax obligations.

The Debtor's tax liabilities for 1998, 1999, 2000, and 2001 are not excepted from dischargeability pursuant to § 523(a)(1)(C) of the Bankruptcy Code.

Accordingly:

**IT IS ORDERED** that:

1. The tax liabilities of the Debtor, Andrew F. Pisko, for the 1998, 1999, 2000, and 2001 tax years are not excepted from the Debtor's discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code, and are therefore dischargeable in the Debtor's Chapter 7 case.

2. A separate Final Judgment will be entered on the Complaint to Determine Dischargeability of Debt in favor of the Debtor, Andrew F. Pisko, and against the Defendant, the United States of America, Internal Revenue Service.